IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | SUPERSEDING |
| HOUSE OF RAEFORD FARMS, INC. | ) | 1:09cr00395-1 |
| GREGORY STEENBLOCK | ) | 1:09cr00395-2 |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

Defendants House of Raeford Farms, Inc., ("House of Raeford") and Gregory Steenblock ("Steenblock") (collectively "Defendants") are currently charged in a superseding indictment with fourteen counts of knowing violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., commonly known as the Clean Water Act ("CWA"), pursuant to 33 U.S.C. § 1319(c)(2)(A). Before the court are Defendants' motions to dismiss the superseding indictment. (Docs. 39 & 41.)[1] The court heard argument on May 3, 2010, and the motions are ripe for decision.

I. **BACKGROUND**

To better understand the context of the present motions, a brief overview of the statutory framework is helpful.

_____
[1] House of Raeford incorporated its arguments from an earlier motion to dismiss the indictment (Doc. 19), and Steenblock simply adopts House of Raeford's briefing (Doc. 41.).

Congress enacted the CWA to restore and maintain the chemical, physical, and biological quality of the nation's waters by eliminating water pollution and protecting and ensuring the propagation of fish, aquatic life, and wildlife in the United States. See 33 U.S.C. § 1251(a). The CWA regulates the discharge of pollutants into municipal sewage treatment plants that release into U.S. waters. 33 U.S.C. § 1317. The municipal sewage treatment plants are known as publicly-owned treatment works ("POTWs"). 40 C.F.R. § 403.3(q).

The CWA prohibits the discharge of pollutants without a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). Id. §§ 1311(a), 1342. Under the CWA, the U.S. Environmental Protection Agency ("EPA") may delegate to the states the authority to implement and enforce NPDES permits. Id. § 1342(b). North Carolina was delegated such authority during the times relevant herein.

Under the NPDES, a POTW must establish pretreatment programs setting forth requirements for industrial users who discharge pollutants to it. 33 U.S.C. § 1342(b)(8); see 40 C.F.R. § 403.3(j). National standards specify the maximum levels of pollutants that can be discharged. 40 C.F.R. § 403.5. A POTW may impose substantive or procedural pretreatment requirements on an industrial user, in addition to a national

2

pretreatment standard, that relate to discharges to a POTW. 33 U.S.C. § 1342(b)(8); 40 C.F.R. 403.3(t).

The CWA provides for criminal penalties for persons who knowingly violate any requirement imposed by an approved pretreatment program. 33 U.S.C. § 1319(c)(2)(A).

The superseding indictment alleges the following:

The City of Raeford ("the City") owns and operates a POTW in Raeford, North Carolina, pursuant to an NPDES permit issued by the North Carolina Department of Environment and Natural Resources ("DENR"). The City is permitted to discharge treated wastewater from the POTW into Rockfish Creek, a tributary of the Cape Fear River. Industrial users such as House of Raeford, which are issued permits through a POTW, are required to comply with the CWA, general pretreatment regulations, and the City's pretreatment program. See 33 U.S.C. § 1342. The City's pretreatment program, which includes a Sewer Use Ordinance[2] ("SUO" or "Ordinance") and Industrial User Pretreatment Permits ("IUPs"), was approved by DENR on May 31, 1983.

House of Raeford is a North Carolina corporation that owns and operates a poultry processing plant in Raeford, North Carolina, and Steenblock was its plant manager. At all times relevant, House of Raeford slaughtered approximately 30,000

---

[2] The SUO is set forth as Exhibits A1 and A2 to Doc. 20 but will be identified as "SUO" in citations herein.

3

turkeys a day. The untreated wastewater generated by this processing contained numerous wastes, including feathers, blood, animal grease, fats, and anatomical parts, all of which constituted "pollutants" as defined by the Clean Water Act. 33 U.S.C. § 1362(6).

Around July 17, 2000, the City reissued to House of Raeford IUP No. 5161 ("IUP #5161" or "the Permit"),[3] allowing House of Raeford to discharge pretreated wastewater from its facility to the City's POTW. The Permit restricted House of Raeford's discharge of such pretreated wastewater to specific parameters, known as total suspended solids, biological oxygen demand, chemical oxygen demand, and acidity and caustic properties. The Permit was re-issued on July 1, 2005, and modified on June 15, 2006, but all versions prohibited discharges that bypassed House of Raeford's treatment facilities unless approved in advance.

On an average day, House of Raeford generated approximately 1 million gallons of wastewater. The wastewater was processed at the plant as follows: Untreated wastewater would initially be discharged into an "offal" area, where it was to be held before proceeding into the facility's pretreatment process. From the offal area, the wastewater would be sent to a flow equalization basin ("FEB"), which was a large pit holding

---

[3] The Permit is set forth as Exhibits B1 through B4 appended to Doc. 20 but will be identified as "Permit" in citations herein.

approximately 37,000 gallons of wastewater. The untreated wastewater would then be pumped from the FEB to two dissolved air flotation units ("DAF units"), each with a capacity of 40,000 gallons. Once in the DAF units, the water would be treated to skim grease from it. The treated wastewater would then be pumped to the City's POTW.

The superseding indictment charges that on a routine and regular basis from no later than February 2005 until no earlier than August 2006, Defendants discharged thousands of gallons of untreated wastewater from the offal pit to the FEB, causing it to overflow. It also charges that from about January 2005 until August 2006, in order to keep the FEB from overflowing, Defendants bypassed pretreatment at the DAF units and discharged the untreated wastewater directly to the sewer (and thus to the POTW).[4]

## II. ANALYSIS

### A. Commerce Clause & Delegable Authority

Defendants move to dismiss the superseding indictment on the grounds that the implementing regulations exceed the authority Congress could delegate to the agency and thus violate the Commerce Clause. Defendants raise three related arguments:

---

[4] The fourteen counts of the superseding indictment allege fourteen instances of illegal discharges at the plant: February 7, 2005; March 23 and 28, 2005; April 4 and 21, 2005; August 8, 2005; September 28, 2005; October 11, 2005; January 29, 2006; February 9 and 22, 2006; March 20 and 28, 2006; and August 4, 2006.

Commerce Clause jurisdiction; non-delegation limitations; and the intelligible principle doctrine.

The foundation of Defendants' argument is <u>United States v. Wilson</u>, 133 F.3d 251, 256-57 (4th Cir. 1997), in which the Fourth circuit struck down as exceeding Congressional authority a United States Army Corps of Engineers regulation that redefined "waters of the United States" under the CWA to include waters whose degradation *could affect* interstate commerce. Analogizing to <u>Wilson</u>, Defendants argue that the EPA regulation under which the City imposed the bypass prohibition -- 40 C.F.R. § 403.3(t) -- lacks any limitation related to interstate or foreign commerce. (Doc. 20 at 13; Doc. 28 at 3-4.) Defendants argue that because the statute criminalizes as a felony any knowing violation of "any requirement" imposed in an approved pretreatment program (33 U.S.C. § 1319(c)(2)(A)), the regulation's broad definition of a "pretreatment requirement" as "any substantive or procedural requirement related to Pretreatment, other than a National Pretreatment Standard, imposed on an Industrial User" (40 C.F.R. § 403.3(t)), grants open-ended authority to a municipality to criminalize conduct. Thus, Defendants argue, the City of Raeford "may or may not have been acting according to the Congressional purpose" when it issued the Permit that prohibited bypasses. (Doc. 28 at 4.)

6

That it "could" have been so acting, Defendants argue, is insufficient under Wilson.

The court need not labor long over this contention. As the Fourth Circuit concluded in United States v. Hartsell, 127 F.3d 343 (4th Cir. 1997), under the CWA, 33 U.S.C. § 1317, Congress clearly intended to regulate pollutant discharges into sewer systems and had the constitutional authority to do so. Cf. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985) (". . . Congress evidently intended . . . to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term."); United States v. Rosenblum, No. 07-295, 2008 WL 582356 , at *8 (D. Minn. Aug. 29, 2008) (noting that under 33 U.S.C. § 1317(b)(1), the CWA creates a separate statutory scheme for pollution discharges into sewers and POTWs, which is within and reasonably related to Congress's power under the Commerce Clause, citing Hartsell).[5] Thus, the charges here – – discharging into a sewer that feeds into a POTW – fall within Congressional authority.

---

[5] Rapanos v. United States, 547 U.S. 715 (2006), in which the Court interpreted the phrase "navigable waters" as used in the CWA, does not change this conclusion. The provision at issue here, 33 U.S.C. § 1317, plainly addresses discharges into sewer systems.

Moreover, Defendants' argument that the statute setting forth criminal liability, 33 U.S.C. § 1319(c)(2)(A),[6] and the regulations defining the terms within that statute, 40 C.F.R. § 403.3(t), overreach Congressional authority lacks merit as applied to Defendants. Defendants point to the fact that in this case no environmental harm was alleged insofar as the City of Raeford POTW was ultimately able to process the discharges to it before releasing its processed product into Rockfish Creek. In essence, Defendants mount a facial challenge to section 1319 by offering hypothetical scenarios where a City regulation might

_____

[6] The statute reads as follows:

> Any person who--
>
> (A) knowingly violates section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, or any requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title or in a permit issued under section 1344 of this title by the Secretary of the Army or by a State;
>
> . . .
>
> shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both. If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $100,000 per day of violation, or by imprisonment of not more than 6 years, or by both.

33 U.S.C. § 1319(c)(2)(A).

not comport with the Commerce Clause and Congress's purpose for the CWA. For example, Defendants cite the City's regulation that requires an industrial user's monitoring reports to be postmarked by a deadline and argue that a violation of that requirement could be grounds for a felony violation under section 1319. (See Doc. 20 at 14-15.)

This argument fails in this case, as the court looks to the conduct charged. See Greenville Women's Clinic v. Bryant, 222 F.3d 157, 163-64 (4th Cir. 2000) (anticipated impact of a regulation subject to a facial challenge is generally not an appropriate basis to strike that regulation); cf. Jordan by Jordan v. Jackson, 15 F.3d 333, 343-44 (4th Cir. 1994) (facial challenge must establish no set of circumstances under which the statute could be valid (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). The Government charged violations of a bypass prohibition present in both the SUO and Permit. These prohibitions are authorized by the regulations, which prohibit bypasses. See 40 C.F.R. § 403.17. Moreover, the CWA does not require actual environmental harm. See Wilson, 133 F.3d at 264 (listing elements of a 33 U.S.C. § 1319(c)(2)(A) violation, in the context of discharges into wetlands without a permit). Rather, the statutory and regulatory scheme makes unlawful any unauthorized discharge capable of causing such harm. That the POTW was able to prevent any damage does not render the

9

Defendants' conduct lawful. Accordingly, as applied to Defendants, the bypass prohibitions are within Congressional authority.

Finally, Defendants argue that Congress has failed to provide an intelligible principle to guide the agency in crafting regulations and that the regulations themselves exceed the scope of the CWA. Rooted in the principle of separation of powers, the non-delegation doctrine prohibits Congress generally from delegating its legislative power to another branch. Mistretta v. United States, 488 U.S. 361, 371-72 (1989). However, Congress may obtain assistance from coordinate branches so long as it provides an "intelligible principle" to guide the party receiving the delegation of power. Id. at 372. To be a valid delegation of legislative power, Congress must clearly delineate three things: (1) the general policy; (2) the public agency to apply it; and (3) the boundaries of the delegated authority – thereby setting forth an intelligible principle. Id. at 372-73. The courts have interpreted this test in a practical way, giving deference to the increasing complexity of society. Id. at 372. Thus, the intelligible principle standard has not been difficult to satisfy. See Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 474 (2001) (listing cases in which Congress' delegation upheld); S.C. Med. Ass'n v. Thompson, 327 F.3d 346, 350 (4th Cir. 2003) (noting the Government's burden is

10

not onerous in demonstrating the existence of an intelligible principle, which is evaluated by the three Mistretta factors).

The alleged bypass violations plainly fall within a purpose Congress intended under the CWA. See 33 U.S.C. § 1251; Hartsell, 127 F.3d at 349 (holding that Congress intended to "legislate against unchecked discharge of pollutants into public sewers which would eventually flow into streams and rivers"). Congress recognized that if not treated at the POTW, the wastewater that Defendants allegedly discharged by bypassing its pretreatment process would result in pollutants entering navigable waters. Moreover, Congress granted the EPA authority to apply the CWA. 33 U.S.C. § 1251(d). Finally, Congress established a permitting scheme through NPDES and delineated requirements for compliance, thus limiting the delegated authority. Id. § 1342(b). The agency and ultimately the City therefore acted within an intelligible principle articulated by Congress.

**B. Vagueness and Ambiguity**

Next, Defendants argue that the documents underlying the superseding indictment contain competing requirements, which render them unconstitutionally vague. Specifically, Defendants argue that the SUO and Permit treat "bypass" as a prohibited event, whereas a Consent Order entered into by the City and Defendants subsequent to the Permit treats "bypass" as a piece

11

of equipment.  Finally, Defendants argue that the vagueness results in subjective and arbitrary prosecution.  The Government counters that the Permit was not vague regarding bypasses and that the Consent Order did not alter the prohibition against them.  Also, the Government argues that there is no basis to conclude that its prosecution is arbitrary.

A criminal conviction is void for vagueness and violates due process when the statute either (1) fails to provide a person of ordinary intelligence fair notice of what activity is prohibited or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement.  United States v. Passaro, 577 F.3d 207, 217 (4th Cir. 2009), cert. denied, 130 S. Ct. 1551 (2010).  Whether Defendants' argument has merit requires an analysis of the underlying laws, regulations, and documents from which liability is asserted.

### 1.  Meaning of "Bypass"

Both the Ordinance and the federal regulation define bypass as "the intentional diversion of wastestreams from any portion of a user's treatment facility."  SUO § 1.2(a)(6); cf. 40 C.F.R. § 403.17(a)(1) ("the intentional diversion of wastestreams from any portion of an Industrial User's treatment facility").  Both the Ordinance and the regulation prohibit bypasses except in

certain articulated circumstances.[7] (SUO § 10.3; 40 C.F.R. § 403.17.) Thus, any diversion of wastewater from the user's pretreatment process constitutes an illegal bypass unless it meets one of these prescribed exceptions.

Like the Ordinance and regulation, the Permit states a general prohibition against bypassing treatment facilities unless pre-approved: "Bypass of treatment facilities is prohibited except when approved in advance by the Control Authority [the City]. Bypass approval shall be given only when such bypass is in compliance with 40 C.F.R. 403.17." (Permit Pt. II, ¶ 7.)

Defendants argue that these provisions conflict with a Consent Order, not mentioned in the superseding indictment, that the parties agree was entered into between the City and House of Raeford in 2005 to address occasional bypasses and overflows from Defendants' industrial facility and pretreatment system.[8] (Doc. 20 at 6.) Apparently, House of Raeford's discharges predating the time period in the superseding indictment resulted

---

[7] Bypass is permitted under the following circumstances: where essential for maintenance to ensure efficient operation, but only if pretreatment standards or requirements are not violated; or where unavoidable to prevent loss of life, personal injury, or severe property damage, no feasible alternatives existed, and proper notice was given; or where approved in advance. 40 C.F.R. § 403.17(b)-(d); SUO § 10.3.

[8] The Consent Order, as amended, is set forth as Exhibit C to Doc. 20 but will be identified as "Consent Order" in citations herein.

in a negotiated agreement with the City to alter House of Raeford's equipment to eliminate the ability to bypass. After discussions began in January 2005, the parties reached an agreement in March 2005 and later memorialized it in writing. (Id.) The Consent Order provides in relevant part:

> In addition, the House of Raeford experiences occasional bypasses and overflows from its industrial facility and pretreatment system during which untreated industrial wastewater; fats, oils and grease (FOG); and animal parts enter the WWTP [wastewater treatment plant] in violation of its permit limits and SUO. These bypasses/overflows originate from a pipe which the House of Raeford currently has disabled with a locking mechanism (Bypass #1), and an overflow pipe within the FEV [sic] pretreatment unit (Bypass #2). The House of Raeford currently has a key to the locking mechanism for Bypass #1, but has assured the City that the bypass remains and will remain locked and unused.

(Consent Order § 1.B.) Defendants argue that the Consent Order thus refers to "bypasses and overflows" without any distinction between the two and that when "bypass" is used separately it refers to a piece of equipment (e.g., "bypass #1" and "bypass #2") and not a process. Defendants contend that these conflicting uses of the term "bypass" render it vague and that, under the rule of lenity,[9] such vagueness precludes enforcement. Defendants also argue that the Government seeks to criminalize their use of an "overflow pipe" of which the City was aware and

---

[9] The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected them" because "no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed." United States v. Santos, 128 S. Ct. 2020, 2025 (2008).

14

which was not defined as a "bypass" in either the Ordinance or the Permit.

The court is not persuaded. The Consent Order identifies two pipes in House of Raeford's pretreatment system as "Bypass #1" and "Bypass #2." These terms appear for ease of description in later references to those pipes as the origin of the bypasses. The same paragraph of the Consent Order provides that "House of Raeford experiences occasional bypasses and overflows from its industrial facility and pretreatment system." (Consent Order § 1.B.) The violation is the *use* of the pipes within the treatment process, not simply the *presence* of those pipes. No ambiguity as to the prohibited conduct exists, and the rule of lenity does not benefit Defendants. See United States v. Eshan, 163 F.3d 855, 858 (4th Cir. 1998) (requiring "grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seize[d] everything from which aid can be derived, it is still left with an ambiguous statute" (quoting Chapman v. United States, 500 U.S. 453, 463 (1991))).

Defendants further argue that the Consent Order permitted the bypasses in this case because it contemplated the construction of new facilities necessary to eliminate bypasses and allowed House of Raeford until September 30, 2006, to eliminate the bypasses and comply with the Permit. Defendants point to the following portions of the Consent Order:

15

5.   On or before September 12th, 2006, the House of Raeford shall complete construction of facilities necessary to remove bypasses, eliminate spills and overflows, and other recommended pretreatment system improvements as approved by the City under Paragraph No. 3 above. . . .

6.   On or before September 30, 2006, the House of Raeford shall permanently eliminate all discharges of untreated wastewater from bypasses, spills, and overflows (including but not limited to eliminating Bypass #1 and Bypass #2) and achieve compliance with IUP #5161 and the Sewer Use Ordinance.

(Consent Order Amend. #5.)   Alternatively, Defendants argue that at a minimum the Consent Order is vague regarding the permissibility of continued bypasses during the pendency of the agreed-upon upgrades to House of Raeford's pretreatment system.

The court is not convinced by this argument, either. Nowhere does the Consent Order authorize bypasses at House of Raeford during the timeframe of construction contemplated in the Consent Order or any of its various amendments.   To the contrary, Section II.A provides that House of Raeford agreed "[d]uring the effective period of this Consent Order, [to] meet and comply with all terms and conditions of IUP #5161 and the SUO, *except those interim effluent limits and monitoring requirements as specified below*."   (Consent Order § II.A (emphasis added).)   House of Raeford agreed to continued compliance with the Permit and the SUO -- both of which prohibited bypasses -- except with regard to the two aspects of effluent limits and monitoring, neither of which involved the

16

bypass prohibition. The court is not persuaded that Section II.B.6 is vague or confusing in light of the earlier paragraphs. Rather, Section II.B.6 simply offers the final date for compliance with the Consent Order. Read as a whole, the Consent Order merely provides a deadline for House of Raeford to remove the bypass equipment and complete construction of a system to eliminate future bypass discharges.

As such, the court finds that the charged violations are not vague or ambiguous so as to have deprived Defendants of prior notice of the offenses with which they are now charged.

2. **Subjective and Arbitrary Prosecution**

Defendants argue that "aspects of the pretreatment program . . . almost seem designed to facilitate subjective, arbitrary enforcement." (Doc. 20 at 20.) Defendants point to provisions of the Ordinance that authorize the director of the POTW to exercise discretion to determine if a violation occurred (SUO § 8.1) and to refer such violations to the county district attorney for potential prosecution (id. § 8.3). This prosecutorial discretion for charging a violation, Defendants contend, indicates that prosecution in this case was arbitrary and subjective. Defendants also point to the lack of environmental harm as an indication of the arbitrariness of the prosecution. The Government contests any vagueness and again

17

notes that environmental harm is not an element of the charged offenses.

Defendants conceded at oral argument that environmental harm is not an element of the charged offenses. See _Wilson_, 133 F.3d at 264; _cf._ _United States v. Ortiz_, 427 F.3d 1278, 1282 (10th Cir. 2005) (noting that only discharge is required, albeit in the context of a negligent violation under 33 U.S.C. § 1319(c)(1)(A)). So, lack of any actual harm is irrelevant to the calculus. Moreover, the provisions of the SUO upon which Defendants rely for their argument refer to prosecution by state or local authorities for violations of state law. This case involves charges by the federal government. While Defendants clearly would have preferred that the Government not exercise its prosecutorial power, such exercise alone does not make it arbitrary or subjective so as to support dismissal of the superseding indictment. The court therefore rejects this claim as a basis for dismissal.

### C. Penalty Notice of Permit

Defendants argue that the Permit violates 40 C.F.R. § 403.8(f)(1) because it fails to enumerate federal criminal penalties for a violation. (Doc. 20 at 21-22.) Defendants contend that this failure renders the Permit deficient and thus bars the Government's prosecution based on it. (_Id._ at 22.) The Government contends that the regulation does not

18

specifically require that federal penalties be listed and that the Permit is therefore valid. (Doc. 50 at 22-23.)

Section 403.8(f)(1)(iii)(B)(5) of Title 40 of the Code of Federal Regulations provides that control mechanisms, such as an IUP, must contain, among other things, a "[s]tatement of applicable civil and criminal penalties for violation of Pretreatment Standards and requirements, and any applicable compliance schedule." The Permit issued to House of Raeford provides in part as follows:

> 16. Federal and/or State Law
>
> Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable Federal and/or State law or regulation.
>
> 17. Penalties
>
> The Sewer Use Ordinance of the Control Authority provides that any person who violates a permit condition is subject to a civil penalty not to exceed $10,000 dollars per day of such violation.
>
> Under state law, (NCGS 143-215.6B), under certain circumstances it is a crime to violate terms, conditions, or requirements of pretreatment permits. It is a crime to knowingly make any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance. These crimes are enforced at the prosecutorial discretion of the local District Attorney.

(Permit Pt. II, ¶¶ 16, 17.)

Defendants ask the court to construe the phrase "applicable civil and criminal penalties" in regulation 403.8(f)(1)(iii)(B)(5) to include "federal" penalties. Defendants provide no authority for such a reading, however. Viewing the statutory and regulatory scheme as a whole, the court concludes that the penalty notice provision of 40 C.F.R. § 403.8(f)(1)(iii)(B)(5) appears to contemplate that a state or locality to whom authority is delegated articulate its own penalties -- those not already enumerated by Congress in its federal statutory framework -- because the industrial user would be subject to enforcement by both sovereigns. Nothing in the CWA or regulations suggests a contrary interpretation. The court, therefore, will not read a requirement into the regulations that is not expressly set forth. The Permit satisfied the regulation's conditions, and Defendants' motion to dismiss on this basis is denied.

D.  **Double Jeopardy**

Finally, Defendants[10] challenge the superseding indictment as violating the Constitution's Double Jeopardy Clause. First,

---

[10]    In his motion to dismiss the superseding indictment, Defendant Steenblock adopts and incorporates House of Raeford's motion, which includes this double jeopardy argument, in whole. (Doc. 41.) Double jeopardy protection is "intrinsically personal," and an employee of a corporation that has been fined does not have a claim of double jeopardy when that employee is later prosecuted. United States v. Halper, 490 U.S. 435, 447 (1989); see also United States v. Louisville Edible Oil Prods., Inc., 926 F.2d 584, 586 (6th Cir. 1991)(finding no double jeopardy protection for defendant employees of a Subchapter S

they argue that the dual sovereignty doctrine does not apply because the Government is relying on local authority for the violations at issue. (*Id.* at 27-28.) Second, they argue that the City has already punished House of Raeford through fines (for the same conduct) that are criminal in nature and thus amount to double punishment. (*Id.* at 24-26.) The Government disagrees and argues that the City's prior enforcement of its own regulations, which are part of a federally-approved program, is not an action of the EPA or any branch of the federal government.[11] (Doc. 50 at 25.)

The Double Jeopardy Clause protects against the imposition of multiple punishments for the same offense in successive prosecutions by the same sovereign. U.S. Const. art. V; <u>Heath v. Alabama</u>, 474 U.S. 82, 88 (1985). However, separate sovereigns may prosecute the same conduct without violating the Double Jeopardy Clause. <u>Heath</u>, 474 U.S. at 88-89; <u>United States v. A-A-A Electrical Co.</u>, 788 F.2d 242, 246 (4th Cir. 1986). The inquiry is whether the sovereigns draw their authority from the same source of power. <u>United States v. Lanza</u>, 260 U.S. 377, 382 (1922) (noting that when sovereigns derive their power from different sources, "an act denounced as a crime by both national

_____

corporation that had been subject to a penalty where the penalty arguably "flowed through" the company directly to defendants). Thus, the double jeopardy argument is inapplicable to Steenblock.
[11] The Government also points out that civil fines were never issued to House of Raeford for the conduct alleged in Counts 7, 8, 10, 11, 13, and 14. (Doc. 50 at 27.)

and state sovereignties . . . may be punished by each"); cf. United States v. Louisville Edible Oil Prods., Inc., 926 F.2d 584, 587 (6th Cir. 1991) (stating that the dual sovereignty doctrine holds the Double Jeopardy Clause inapplicable to separate sovereigns even if both criminal suits are for the same offense (citing United States v. A Parcel of Land, Etc., 884 F.2d 41, 43 (1st Cir. 1989)).  An exception to the dual sovereignty doctrine may exist if one sovereign is merely acting as the "tool" of the other such that the second prosecution is a sham.  See Bartkus v. Illinois, 359 U.S. 121, 122-23 (1959).  "[T]hat exception may only be established by proof that State officials had little or no independent volition in their proceedings."  In re Kunstler, 914 F.2d 505, 517 (4th Cir. 1990).

Defendants do not cite a case directly on point.  Where a statute contemplates state enforcement pursuant to a federally-approved program, such as here, there is no demonstrated double jeopardy violation as long as the two entities draw their authority to punish from separate sources of power.  See United States v. Price, 314 F.3d 417, 419-22 (9th Cir. 2002) (noting that adoption of local regulations promulgated pursuant to state law that mirror federal regulations and were approved as part of a federally-approved National Emissions Hazardous Air Pollutants program under the Clean Air Act's delegated authority did not

render the state acting under federal authority); <u>Louisville</u> <u>Edible</u>, 926 F.2d at 587-88 (rejecting claims that fines levied against defendant by the local environmental enforcement agency for violations of state environmental laws bars federal prosecution under federal law).

Dual sovereignty exists here such that the City's imposition of fines should not be construed as an earlier punishment by the federal government. While the City did act under delegated authority in implementing the federal scheme, that relationship did not strip either sovereign of its individual power to enforce its own laws. Under the statutory framework of the CWA, states are not preempted from adopting and enforcing their own regulations. <u>See</u> 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use . . . of land and water resources . . . ."). Rather, states may apply to participate in the NPDES permit scheme. The state may submit to the EPA "a full and complete description of the program it proposes to establish and administer under State law." <u>Id.</u> § 1342(b). Such program shall be approved so long as there is adequate state authority. <u>Id.</u> Further, the state is required to comply with certain federal requirements, but compliance does not prevent the state from

establishing more stringent requirements. <u>See</u> <u>id.</u>; <u>id.</u>
§ 1317(b)(4) ("Nothing in this subsection shall affect any
pretreatment requirement established by any State or local law
not in conflict with any pretreatment standard established under
this subsection."); <u>cf.</u> <u>id.</u> § 1316 (authorizing state standards
of performance if the EPA finds that they are applied and
enforced "to at least the same extent as required by this
section").

In addition to the federal statutory scheme, the state
statutory scheme indicates a separate source of authority for a
criminal prosecution. A corresponding felony for knowing
violation of a permit exists under North Carolina General
Statute § 143-215.6B(g). The N.C. General Assembly authorized
the development of effluent standards and waste treatment
practices so as to prohibit and control water pollution, N.C.
Gen. Stat. § 143-215, and require a permit for waste disposal,
N.C. Gen. Stat. § 143-215.1.

Additionally, the federal regulations and the SUO indicate
that each sovereign operated under its own authority to enforce
its laws. The SUO directs the POTW director to consult the
county district attorney -- not the EPA -- in order to bring
criminal charges. <u>See</u> SUO § 8.3. In addition, the federal
regulations contemplate that a POTW may enforce its legal
authority in federal, state, or local court, with the authority

24

for such enforcement authorized by <u>state</u> law. 40 C.F.R. § 403.8(f)(1). In this case, the Permit specifically cited as the source for state prosecution N.C. Gen. Stat. § 143-215.6B, which provides for enforcement of violations of state environmental laws. (Permit Pt. II, ¶ 17.) Thus, the City was not acting as the "tool" of the federal government when it imposed civil fines.[12]

Based upon the above, the court concludes that the City's enforcement authority derived from state law such that the dual sovereigns doctrine applies. Having so found, the court need not reach House of Raeford's argument that the civil fines should be viewed as penal in nature for double jeopardy analysis. House of Raeford's argument of double jeopardy therefore fails.


III. CONCLUSION

Having considered all of Defendants' arguments and for the foregoing reasons,

---

[12]   N.C. Gen. Stat. § 143-215.6B provides that "[n]o proceeding shall be brought or continued under this section for or on account of a violation by any person who has previously been convicted of a federal violation based upon the same set of facts." That the state of North Carolina has decided to prohibit prosecution where a federal prosecution has occurred does not compel the conclusion that the federal government must do likewise and that prosecution is therefore barred by the Double Jeopardy Clause.

IT IS THEREFORE ORDERED that the motions to dismiss the superseding indictment by Defendants House of Raeford and Steenblock (Docs. 39 & 41) are DENIED.

/s/   Thomas D. Schroeder
United States District Judge

May 27, 2010